# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

—o0o—

| | |
|---|---|
| DOUGLAS BEEKS, | ) 1:05-CV-00791 LJO JMD HC |
| Petitioner, | ) FINDINGS AND RECOMMENDATION |
| v. | ) REGARDING PETITION FOR WRIT OF |
| | ) HABEAS CORPUS |
| GEORGE GIURBINO, | ) |
| Respondent. | ) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This action has been referred to this court pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-302.

### PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, imposed on April 10, 2003. Following a jury trial, Petitioner was found guilty of grand theft person (Cal. Penal Code[1] § 487©); Count 1) and resisting, delaying or obstructing a peace officer (§ 148, Count 3).  In

---

[1] All further statutory references are to the California Penal Code unless otherwise noted.

addition, the jury found "true" the allegations that Petitioner had previously been convicted of "serious felony" (i.e. "strike") offenses (§§ 667(b)-(I), 1170.12(a)-(d)), and that he had served a prior term of imprisonment as a result of his felony convictions (§ 667.5(b)).  Petitioner was sentenced to a term of twenty-five (25) years to life in state prison on Count 1.  Petitioner was also ordered to serve two years, consecutive, for two of the prior prison term enhancements. Petitioner was sentenced to serve six months in the county jail on Count 3, to be served concurrently with the sentence imposed for Count 1.  Petitioner was further ordered to pay a $200 restitution fine.

Thereafter, Petitioner timely filed a notice of appeal with the California Court of Appeal, Fifth Appellate District ("Fifth DCA") on April 11, 2003.  On April 6, 2004, the Fifth DCA affirmed Petitioner's conviction and sentence.  (Answer, Ex. 7).

On May 25, 2004, the California Supreme Court declined Petitioner's petition for relief from default.[2]

On May 28, 2004, Petitioner filed a Petition for Writ of Habeas Corpus in the California Supreme Court, case number S125209.  The California Supreme Court summarily denied the petition on April 13, 2005.

On February 9, 2005, Petitioner filed a Petition for Writ of Habeas Corpus in the California Supreme Court, case number S131392.  The petition was summarily denied on January 18, 2006.

On April 13, 2006, Petitioner filed his First Amended Petition for Writ of Habeas Corpus before this court.[3]  The Amended Petition alleges several grounds for relief: (1) ineffective assistance of counsel; (2) cruel and unusual punishment; (3) permitting an incompetent person to testify at trial; and (4) prosecutorial and/or judicial misconduct.

Respondent filed its Answer to the Amended Petition on July 11, 2007.  Petitioner filed a

---

[2]  Petitioner sought relief from default for failure to timely file a petition for review of the Fifth DCA's decision due to a calendaring error.

[3]  Petitioner's original Petition for Writ of Habeas Corpus was filed in this Court on June 16, 2005.  The petition was stayed and subsequently amended.

Traverse to Respondent's Answer on August 7, 2007.

## FACTUAL BACKGROUND

The Court adopts the facts as summarized by the 5th DCA in its opinion dated April 6, 2004:

At approximately 10:45 p.m. on December 23, 2002, [Petitioner] approached developmentally disabled 30-year-old Mark Cantrell at the Bakersfield bus station. [Petitioner] asked Cantrell for money and told him he was going to kill him. When Cantrell refused, [Petitioner] reached into Cantrell's pocket, took his wallet, and ran away. The wallet contained $60 in cash along with Cantrell's birth certificate, medical card, bus pass, and a Barnes & Noble bookstore membership card.

Bakersfield Police Officer Lester Riddle immediately interviewed Cantrell and reported [Petitioner]'s description to other officers in the area. At approximately 11:00 p.m., Officer Matthew Roy observed [Petitioner] walking along the street. Officer Roy illuminated [Petitioner] with a spotlight and exited his patrol car. When the officer asked if they could speak, [Petitioner] ran in the opposite direction. Officer Roy pursued Cantrell into a hotel, where he saw [Petitioner] toss some items into a bathroom. [Petitioner] eventually tripped and Officer Roy apprehended him. In the bathroom, the officer found three $200 bills, a Barnes & Noble membership card, and a birth certificate bearing Cantrell's name.

Officer Riddle met [Petitioner] at the hotel and took him to the central receiving facility for booking. At the facility, Officer Riddle searched [Petitioner] and found two bus passes in his jacket pocket. The name "Mark Cantrell" was printed on the back of one of the passes.

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the

1   Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. §

2   2254(a); 2241(d).  Accordingly the Court has jurisdiction over this action.

3        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

4   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

5   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008 (1997); Jeffries

6   v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th

7   Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy,

8   521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment).  The

9   instant petition was filed after the enactment of the AEDPA and is therefore governed by its

10  provisions.

11  II.  Standard of Review

12       This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

13  custody pursuant to the judgment of a state court only on the ground that he is in custody in

14  violation of the Constitution or laws or treaties of the United States."  28 U.S.C . § 2254(a).

15       The instant petition is reviewed under the provisions of the AEDPA.  Lockyer v.

16  Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, a petition for habeas corpus will not be

17  granted unless the adjudication in question "resulted in a decision that was contrary to, or

18  involved an unreasonable application of, clearly established Federal law, as determined by the

19  Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable

20  determination of the facts in light of the evidence presented in the State Court proceeding."  28

21  U.S.C. § 2254(d); *see* Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

22       As a threshold matter, this Court must "first decide what constitutes 'clearly established

23  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71,

24  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining "clearly established Federal law," the Court

25  looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the

26  relevant state-court decision."  Id., *quoting* Williams, 592 U.S. at 412.  "In other words, 'clearly

27  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth

28  by the Supreme Court at the time the state court renders its decision."  Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; *see also* Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

This Court may not issue the writ simply because in its independent judgment the state court decision applied clearly established federal law erroneously or incorrectly; for a writ to issue, 'that application must also be unreasonable." Id. At 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable." Id. At 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, ninth circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *See* Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th cir. 1999).

AEDPA requires that this court give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). Moreover, we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

Application of these standards is significantly impeded where, as here, the state court supplies no reasoned decision on some or all of a petitioner's claims. Delgado v. Lewis, 223 F.3d 976, 981 (9th Cir.2000). Under such circumstances, the Court independently reviews the record to

determine whether the state court clearly erred in its application of Supreme Court law. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law."); see also, e.g., Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir.2002).  That is, although the Court independently reviews the record, it still defers to the state court's  ultimate decision.

III.  Review of Petitioner's Claims

**A.     Claim One: Ineffective Assistance of Counsel**

In his first claim, Petitioner alleges that he received constitutionally deficient representation from his appointed state trial and appellate counsel. Petn. At 5, 14-33. Specifically, Petitioner asserts he is entitled to relief because: (1) trial counsel refused to vigorously advocate on Petitioner's behalf after Petitioner refused to accept a plea bargain; (2) trial counsel declined to present the clothing Petitioner was wearing at the time of his arrest as evidence; (3) trial counsel failed to obtain surveillance tapes from the Bakersfield Hotel, which would have shown that Petitioner did not match the description of the suspected thief; (4) trial counsel failed to obtain and introduce audiotape recordings of the police radio calls pertaining to the incident; (5) trial counsel failed to file a motion to exclude the identification testimony of Mr. Cantrell as the product of an allegedly suggestive lineup; and (6) appellate counsel's failure to timely file a petition for review of the Fifth DCA's decision on direct appeal prejudiced Petitioner's ability to obtain relief in the California Supreme Court.  Id.

2.  Legal Standard

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

ed

the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

        3.  Analysis of Petitioner's Claim

As noted above, Petitioner alleges numerous instances of ineffective assistance. We will address each in turn.

        (1)  Failure to Vigorously Defend Following Plea Bargain Rejection

Petitioner first asserts his trial counsel was ineffective in that trial counsel failed to

vigorously advocate on Petitioner's behalf following Petitioner's rejection of the prosecutor's

plea offer of twenty-five years to life in prison.  Petn. at 15.  Petitioner "asserts that [trial

counsel]'s actions were prejudicial and far below prevailing professional [n]orms."  Id..  In

support of this claim, Petitioner notes that at trial he requested substitute counsel.  Petn. at 111-

23.

The decision of the Fifth DCA was not objectively unreasonable.  First, as Respondent

correctly notes, trial counsel would possibly have been subject to an allegation of ineffective

assistance had he *not* related the plea offer to Petitioner.  See United States v. Leonti, 326 F.3d

1111, 1117 (9th Cir. 2003) (noting an attorney should not "fail to advise a client to enter a plea

bargain when it is clearly in the client's best interest").  Petitioner potentially faced a much

longer term of imprisonment had he been convicted of all the charges and enhancements with

which he was accused.

Moreover, nothing in the record indicates that trial counsel did anything other than

vigorously, albeit unsuccessfully, advocate on Petitioner's behalf at trial.  We note by way of

example that trial counsel did secure an acquittal on the charge of making a criminal threat (Cal.

Pen. Code § 422; Count 2).  Clerk's Transcript on Appeal ("CT") at 259.  As the record does not

support Petitioner's assertion that his rejection of the prosecution's plea bargain resulted in less

than vigorous advocacy by his trial counsel, his ineffective assistance claim should be denied.

(2)  Failure to Introduce Petitioner's Clothing Into Evidence

Petitioner's second contention is that his trial counsel was ineffective for failing to

present into evidence the clothing Petitioner was wearing at the time of his arrest.  Petn. at 16,

20.  Petitioner claims that the clothing he was wearing at the time he was arrested would have

affirmatively disproved that he was the person who had stolen Cantrell's wallet, and that trial

counsel therefore rendered ineffective assistance by not admitting this evidence at trial.

We find the Fifth DCA's denial of Petitioner's claim was not unreasonable.  Even if trial

counsel's failure to introduce Petitioner's clothing into evidence constituted ineffective

assistance of counsel, Petitioner's claim fails because Petitioner has not demonstrated that he was

prejudiced by this omission.  The trial record is replete with evidence implicating Petitioner in

ed

the theft of Cantrell's wallet.

Cantrell described the suspect to police as being a black male, approximately 30 years old, five foot six-to-eight inches tall, of medium build, wearing a blue jacket and dark pants. Reporter's Transcript on Appeal ("RT") at 104-105.  Officer Matthew Roy testified that he saw Petitioner walking down the street and that Petitioner generally matched the description of the suspected thief.  Officer Roy put his spotlight on Petitioner and got out of his patrol car.  As he approached Petitioner, Petitioner ran from him.  RT 107-108.  Officer Roy pursued Petitioner to a nearby hotel.  RT 108.  As Officer Roy chased Petitioner through the hotel's second floor hallway, he witnessed Petitioner toss some objects into a communal bathroom RT at 112-13. Officer Roy apprehended Petitioner after Petitioner tripped on the stairs trying to go back down to the first floor of the hotel.  RT at 113.  A search of the bathroom into which Officer Roy had seen Petitioner discard some objects revealed three twenty-dollar bills, a Barnes and Noble card, and a birth certificate.  RT at 115.

Police Officer Riddle arrived at the Bakersfield Hotel, and Officer Roy gave Riddle the items he had found in the hotel bathroom.  RT at 98-99.  Riddle put Petitioner in his patrol car. As Riddle was taking Petitioner to the jail to be booked, Petitioner said "he wasn't the person responsible for [the Cantrell] robbery."  RT at 99.  Petitioner claimed he "had been at The Mint bar across the street from the Bakersfield Hotel up until the time that Officer Roy made contact with him."  Id.

In short, there was substantial evidence of Petitioner's guilt, most notably Petitioner's inability to credibly explain how he came to possess Cantrell's birth certificate, Barnes & Noble card, and bus pass a short time after the victim's wallet was stolen.  Given this evidence of his guilt, Petitioner has failed to demonstrate how the admission of his clothing into evidence would have led to a different result at trial.  Accordingly, the claim should be denied.

(3) Failure to Obtain Surveillance Videotapes or Obtain Testimony of Witnesses to the Arrest

Petitioner alleges his trial counsel was ineffective in failing to obtain surveillance videotapes from the Bakersfield Hotel.  Petn. at 17.  He claims that had trial counsel obtained the surveillance camera video from the night of December 23, 2002, it "would have proved beyond

1   doubt that [Petitioner] does not match the physical or clothing description of the perpetrator of

2   the crime." Id. Petitioner further claims trial counsel was ineffective in that he "failed to

3   investigate for possible witnesses to corroborate [Petitioner]'s testimony in the event he were to

4   testify." Petn. at 17.

5       With respect to the alleged failure to obtain video surveillance footage from the

6   Bakersfield Hotel, Petitioner's claim is purely speculative. In order to demonstrate ineffective

7   assistance of counsel, Petitioner must identify the acts or omissions "that are alleged not to have

8   been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. Here,

9   Petitioner fails to demonstrate:   (a) the Bakersfield Hotel had a surveillance camera; (b) the

10  camera was operational; © the camera captured the events in the lobby on the night in question;

11  and (d) that this evidence had probative value. Absent any such demonstration, Petitioner cannot

12  establish either that trial counsel's actions were constitutionally deficient or that he was in any

13  way prejudiced as a result. The Fifth DCA's rejection of Petitioner's claim is not objectively

14  unreasonable.

15      Similarly, Petitioner's claim that trial counsel was ineffective in failing to locate and

16  present the testimony of persons in the hotel lobby at the time Petitioner was being pursued by

17  Officer Roy is purely speculative and without merit. Petitioner fails to identify what testimony

18  he may have given that could have been corroborated by eyewitnesses, assuming eyewitnesses

19  could even be located. Petitioner merely asserts that the "missing testimony of the hotel

20  witnesses would have altered significantly the evidentiary posture of the case." Petn. at 18.

21  Absent any evidence that this is the case, Petitioner's assertion alone is insufficient to support a

22  finding either that trial counsel was ineffective or that the failure to obtain eyewitness testimony

23  in any way prejudiced his defense.

24          (4) Failure to Obtain and/or Present Evidence of Police Dispatch Audiotapes

25      Petitioner next claims trial counsel was ineffective in failing to obtain and introduce into

26  evidence audiotape recordings of the police radio calls pertaining to the theft and to his capture.

27  Petn. at 17-18. Petitioner claims the tapes might have revealed "what the victim described to

28  police that the perpetrator was wearing, what his height was, how much he weighed, his age, his

ethnicity, et cetera." Petn. at 17.

Petitioner's claim is without merit.  The record indicates that testifying officers did in fact describe for the jury what the police dispatcher told them in regard to the description of the suspect.  The dispatcher described the suspect as a black male, approximately 30 years old, five foot six-to-eight inches tall, medium build, and wearing a blue jacket and dark pants.  RT at 104-05.  Officer Roy testified that this description prompted him to put his spotlight on Petitioner and exit his patrol car.  As Officer Roy approached Petitioner, Petitioner ran away from him, prompting the pursuit into the Bakersfield Hotel which eventually led to Petitioner's arrest.  RT at 106-07.

Additionally, the record discloses that the failure to present evidence of the police radio call tapes at trial was a strategic decision on the part of trial counsel.  Trial counsel told the court that he requested but did not receive a copy of the audiotapes.  He stated, however, that he had reviewed a copy of the dispatch log "and based on what the log is, I don't see there's anything here that I would want to introduce into evidence." RT at 150.  Petitioner fails to demonstrate that trial counsel's failure to pursue or to present the dispatch audiotapes as evidence was anything other than sound trial strategy.  See Kimmelmann v. Morrison, 477 U.S. 365, 384 (1986).  Accordingly, Petitioner's claim should be denied.

### (5) Failure to Move to Exclude the Victim's Identification of Petitioner

Petitioner claims trial counsel's performance was ineffective in that he failed to file a motion to exclude the identification testimony of the victim as the product of an impermissibly suggestive lineup.  Petn. at 19.  In support of this claim, Petitioner points to the police report in which it is noted that Mr. Cantrell positively identified Petitioner as the perpetrator at an in-field showup.  Petn. at 19, 21.

A pretrial identification violates due process if, under the totality of the circumstances, it is impermissibly suggestive and gives rise to a substantial likelihood of irreparable misidentification.  Foster v. California, 394 U.S. 440, 442-43 (1968); Simmons v. United States, 390 U.S. 377, 383-84 (1968).  The Supreme Court has upheld the constitutionality of show-up identifications at the scene of the arrest.  See e.g. Neil v. Biggers, 409 U.S. 188, 198-99 (1972).

ed

1   The Ninth Circuit has held that show-up identifications are not unconstitutional unless the

2   "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of

3   irreparable misidentification." United States v. Kessler, 692 F.2d 584, 585 (9th Cir. 1982)

4   (citation omitted). The Kessler court further notes that a properly conducted show-up

5   identification is a "salutary" procedure, as it permits eyewitnesses to identify a perpetrator while

6   the incident is fresh in their minds. Id.

7        Petitioner argues that the circumstances of the show-up produced a procedure so

8   impermissibly suggestive as to give rise to a very substantial likelihood of mistaken

9   identification. Petn. at 19. Petitioner was detained, handcuffed, and in the back of a patrol car at

10  the time of the identification. However, as Respondent notes, several Ninth Circuit decisions

11  have upheld the constitutionality of an identification under similar circumstances. In Kessler, for

12  instance, the court held that a show-up identification was not impermissibly suggestive despite

13  the suspect being handcuffed and surrounded by police officers at the time. The court held that

14  those indicia of custody were "necessary for the prompt and orderly presentation of the suspect,

15  consistent with protection of the officers and witnesses." Kessler, 692 F.2d at 587. Similarly, in

16  United States v. Bagley, 772 F.2d 482 (9th Cir. 1985), the court found a one-man show-up at a

17  bank with the defendant handcuffed and surrounded by law enforcement officers shortly after the

18  robbery was suggestive, but not impermissibly so. Id., at 491-92.

19       In light of this authority, Petitioner has not demonstrated that trial counsel's decision not

20  to pursue a motion to suppress the victim's on-scene identification constitutes ineffective

21  assistance of counsel. See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (trial counsel is not

22  ineffective for failing to make motions that he reasonably believes to be futile). Moreover, given

23  the substantial evidence of Petitioner's guilt above and beyond the victim's identification,

24  Petitioner fails to demonstrate the requisite prejudice to sustain a claim of ineffective assistance

25  of counsel. Accordingly, the claim should be denied.

26              (6)  Ineffective Assistance of Appellate Counsel

27       Finally, Petitioner alleges that his state-appointed appellate counsel rendered ineffective

28  assistance due to her failure to timely file a petition for review of the Fifth DCA's decision, as

1  well as her refusal to raise various claims of trial court error presented to her by Petitioner.  Petn.

2  at 23-25, 29-30, 54.

3      As with trial counsel, effective assistance of appellate counsel is guaranteed by the Due

4  Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).

5  Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's

6  two-pronged test.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle,

7  792 F.2d 846, 847 (9th Cir.1986); See, also, Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54

8  (1988) (holding that where a defendant has been actually or constructively denied the assistance

9  of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed;

10  the implication is that Strickland does apply where counsel is present but ineffective).

11      To prevail, Petitioner must show two things.  First, he must establish that appellate

12  counsel's deficient performance fell below an objective standard of reasonableness under

13  prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052,

14  2064 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a

15  reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on

16  appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence

17  in the outcome. Id. The relevant inquiry is not what counsel could have done; rather, it is whether

18  the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th

19  Cir.1998).

20      The presumption of reasonableness is even stronger for appellate counsel because he has

21  wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized

22  as one of the hallmarks of effective appellate assistance. Miller v. Keeney, 882 F.2d 1428, 1434

23  (9th Cir.1989).  Appealing every arguable issue would do disservice to the Petitioner because it

24  would draw an appellate judge's attention away from stronger issues and reduce appellate

25  counsel's credibility before the appellate court. Id.  Appellate counsel has no constitutional duty

26  to raise every nonfrivolous issue requested by petitioner. Id at 1434 n10 (citing Jones v. Barnes,

27  463 U.S. 745, 751-54, 103 S.Ct. 3308 (1983)).

28      We turn first to Petitioner's claim that he is entitled to relief based on appellate counsel's

1    failure to timely file a petition for review of the Fifth DCA's decision.  Appellate counsel timely

2    filed opening and reply briefs on Petitioner's behalf before the Fifth DCA.  However, due to a

3    calendaring error appellate failed to timely file a petition for review in the California Supreme

4    Court.  See Petn. at 26-31 (Appellate Counsel's correspondence with Petitioner and her

5    application for relief from default to the California Supreme Court).  The California Supreme

6    Court denied review on the grounds that the petition was not timely filed.  Petn. at 32 (California

7    Supreme Court denial of review).  Subsequent to this denial, Petitioner's appellate counsel

8    continued to act on his behalf, filing a petition for writ of habeas corpus in the California

9    Supreme Court.  See Answer, Ex. 9.  This state habeas petition presented the identical issue

10   which would have been raised in the petition for review to the California Supreme Court had

11   relief from default been granted.

12        We need not address whether appellate counsel's failure to timely file a petition for

13   review in the California Supreme Court fell below an objective standard of reasonableness under

14   prevailing professional norms.   Strickland, 466 U.S. at 687-88.  Petitioner's claim is without

15   merit, as Petitioner has not demonstrated a reasonable probability that, but for appellate counsel's

16   unprofessional errors, he would have prevailed on appeal. Id. at 694.   As discussed above, the

17   claims Petitioner would have raised in his petition to the California Supreme Court are without

18   merit.  That Petitioner was not prejudiced by appellate counsel's error is demonstrated by the fact

19   that the California Supreme Court denied identical claims when they were presented in

20   Petitioner's habeas corpus petition before the same court.

21        Finally, Petitioner claims prejudicial error in that appellate counsel "would not raise any

22   of the issues" that he raises in the instant Petition.  Petn. at 23.  This claim is also without merit.

23   It is well-settled that appellate counsel does not have a constitutional duty to raise every

24   nonfrivolous issue requested by defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983);

25   Miller v. Keeney, 882 F.2d 1428, 1434 n. 10 (9th Cir. 1989).  The weeding out of weaker issues is

26   widely recognized as one of the hallmarks of effective appellate advocacy.  Id. at 1434 (footnote

27   and citations omitted).  As a result, appellate counsel will frequently remain above an objective

28   standard of competence and have caused her client no prejudice for the same reason--because she

declined to raise a weak issue.  Id.  In her August 7, 2003 letter to Petitioner, appellate counsel

indicates that she carefully considered claims not ultimately raised in her petition (including

claims requested by Petitioner), but ultimately rejected them.  See Petn. at 24-25.  And as

discussed elsewhere in this Findings and Recommendation, the issues Petitioner claims should

have been raised are without merit.  Appellate counsel's decision not to raise these issues does

not constitute ineffective assistance of counsel; nor was Petitioner prejudiced by virtue of their

exclusion.  Accordingly, Petitioner's claim should be denied.

### B.    Claim Two:  Cruel and Unusual Punishment

In his second claim, Petitioner asserts that his sentence under California's Three Strikes

law is cruel and unusual and thus violates the Eighth Amendment's prohibition on excessive

punishment.  Petn. at 34-44.  Petitioner was sentenced to twenty-five years to life in prison, plus

two years of enhancements.

### 1.    Governing Legal Standard

A criminal sentence that is not proportionate to the crime for which a defendant is

convicted may indeed violate the Eighth Amendment.  The Supreme Court recently decided two

cases which discuss the clearly established federal law applicable to California Three Strikes

cases.  See Ewing v. California, 538 U.S. 11 (2003); Lockyer v. Andrade, 538 U.S. 63 (2003).

In Andrade, the Supreme Court discussed the current state of Eighth Amendment

proportionality review and held that the only clearly established governing legal principle is that

a "gross disproportionality" review applies to criminal sentences for a term of years.  Id. at 73.

Citing extensively to its past cases dealing with criminal sentencing and proportionality under the

Eighth Amendment, the Court acknowledged that it has "not established a clear and consistent

path for courts to follow."  Id.

The Supreme Court held that "the only relevant clearly established law amenable to the

'contrary to' or 'unreasonable application of' frame work is the gross disproportionality

principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and

'extreme' case."  Id.  The Court analyzed Andrade's sentence under Rummel v. Estelle, 445 U.S.

263 (1980), Solem v. Helm, 463 U.S. 277 (1983) and Harmelin v. Michigan, 501 U.S. 957

(1991), and held that the state court "did not confron[t] a set of facts that are materially

indistinguishable from a decision of this Court and nevertheless arrive at a result different from

our precedent." Id. at 73-74.  Using section 2254(d)(1)'s "unreasonable application" clause, the

Court also held that it was not objectively unreasonable for the California Court of Appeal to

conclude that the contours of the gross disproportionality principle permitted an affirmance of

Andrade's Three Strikes sentence.  Id. at 75-77.

In Ewing, the Supreme Court again reviewed the constitutionality of a Three Strikes

sentence of 25 years to life for stealing three golf clubs.  After reviewing the Court's Eighth

Amendment jurisprudence, the Court chose to adopt Justice Kennedy's view [4] that:

> [There are] four principles of proportionality review-- the primacy of the
> legislature; the variety of legitimate penological schemes; the nature of our federal
> system; and, the requirement that proportionality be guided by objective factors–
> that inform the final one: The Eighth Amendment does not require strict
> proportionality between the crime and the sentence.  Rather, it forbids only
> extreme sentences that are 'grossly disproportionate' to the crime.

Ewing, at 23.

Recognizing that state legislatures have a right to formulate penological schemes

consistent with the state's policy goals and free from federal intrusion, the Court validated the

California Three Strikes law, stating "[s]electing the sentencing rationales is generally a policy

choice to be made by the state legislatures, not the federal courts."  Id. at 25.  The Court deferred

to the California Legislature's policy judgement to enact a tough recidivism statute and held that

states have "a valid interest in deterring and segregating habitual criminals."  Id. (citing Parke v.

Raley, 506 U.S. 20, 27 (1992)).

In conducting a proportionality review of Ewing's sentence, the Court stated, "[i]n

weighing the gravity of Ewing's offense, we must place on the scales not only his current felony,

but also his long history of felony recidivism."  Id. at 29.  The Court noted that "any other

approach would fail to accord proper deference to the policy judgments that find expression in

the legislature's choice of sanctions."  Id.  In imposing a Three Strikes sentence on a recidivist

---

[4]As expressed in his concurring opinion in Harmelin v.  Michigan, 501 U.S. 957, 1001
(1991)(citing Solem v.  Helm, 463 U.S. 277, 288 (1983).

criminal, the Court recognized the state's interest in dealing "in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law." Id. (citing Rummel v. Estelle, 445 U.S. 263, 276 (1980)).  Accordingly, proportionality review must take this interest into account.  Id.  The Court held that Ewing's sentence of 25 years to life was justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by Ewing's long, serious criminal record.  Id.

In reviewing Petitioner's claim, this Court will begin with a brief overview of the Eighth Amendment jurisprudence and the proportionality standard.  In Rummel, the Court upheld a life sentence imposed under a Texas recidivist statute for a defendant convicted of obtaining $120.75 by false pretenses, an offense normally punishable by imprisonment for two to ten years. Rummel, 445 U.S. at 266, 100 S.Ct. at 1135.  However, because he had two prior felony convictions (for fraudulent use of a credit card and passing a forged check), and had served two prior prison terms, the prosecution chose to proceed under the state's recidivist statute, which carried a life sentence.  Id.  The Supreme Court held that Rummel's sentence of life imprisonment *with* the possibility of parole did not violate the Eighth Amendment.  Id. at 265-266 (emphasis added).  The Court noted that Rummel had suffered two separate convictions and terms of imprisonment for each prior, that he would be eligible for parole in twelve years, and that under the Texas recidivist statute, prosecutors retained the discretion not to invoke the statute for "petty" offenders.  Id. at 278-81.

Three years later, the Supreme Court set forth the criteria for finding a sentence to be cruel and unusual punishment under the federal Constitution and affirmed a decision of the Eighth Circuit holding unconstitutional a sentence of life imprisonment without the possibility of parole for a seven-time nonviolent felony recidivist.  Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001 (1983).  Defining a three-part proportionality criteria, the Court concluded that Solem's sentence was grossly disproportionate to his crime of uttering a "no account" check for $100.00, even in light of his prior six nonviolent felony convictions: three for third degree burglary, one for obtaining money under false pretenses, one for grand larceny, and one for driving while

intoxicated.  Id. at 279-81.  The Court emphasized that Solem's life sentence was far more severe than the sentence it had considered in Rummel, because Rummel was likely to be eligible for parole in twelve years, while Solem was given no possibility of parole at all.  Id.

In Harmelin, the defendant received a mandatory sentence of life in prison *without* the possibility of parole for possession of more than 650 grams of cocaine, his first felony offense. 501 U.S. 957 (1991)(emphasis added).  The Supreme Court upheld the sentence, with five justices agreeing, for varying reasons, that the sentence did not violate the Eighth Amendment. Although the Court did not produce a majority opinion, seven justices favored some manner of proportionality review.  Justice Kennedy, joined by Justices O'Connor and Souter, stated that a noncapital sentence could violate the Eighth Amendment if it was "grossly disproportionate" to the crime, but concluded that courts need not examine the second and third factors of intrajurisdictional and interjurisdictional reviews discussed in Solem, unless "a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."  Id. at 1005.

The majority of the justices in the Harmelin Court agreed that outside capital punishment, deeming a sentence cruel and unusual punishment is "exceedingly rare" due to the lack of objective guidelines for terms of imprisonment.  501 U.S. at 964.  The threshold for such an inference of disproportionality is high.  See id. at 1001 (Kennedy, J. concurring).  Generally, so long as the sentence imposed by the state court does not exceed statutory maximums, the sentence will not be considered cruel and unusual punishment under the Eighth Amendment. United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990).

The Harmelin Court concluded that the defendant's sentence did not meet the threshold factor of "gross disproportionality."  Justice Kennedy stressed the serious nature of Harmelin's offense, stating that the offense "threatened to cause grave harm to society" unlike "the relatively minor, nonviolent crime at issue in Solem."  Harmelin, 501 U.S. at 1002.  Justice Kennedy further noted that the "possession, use, and distribution of illegal drugs represent 'one of the greatest problems affecting the health and welfare of our population.'" and that the quantity of cocaine possessed by Harmelin had a potential yield of between 32,500, and 65,000 doses.  Id.

1            3.      Analysis of Petitioner's Claim

2       The state courts' determination of this issue was not objectively unreasonable.

3   Petitioner's sentence of twenty-seven years to life does not raise an inference of gross

4   disproportionality to his crimes.  Petitioner received a sentence of 27 years to life for having been

5   convicted of grand theft person and for having a number of prior violent or serious felonies.

6       Petitioner has an extensive criminal history which includes: (1) a felony conviction in

7   1978 for possession of a controlled substance (three years probation); (2) a conviction for

8   burglary and possession of known stolen property in 1979 (sixteen months in state prison); (3) a

9   conviction for burglary in 1981 (two years in state prison); (4) a conviction for burglary in 1985

10  (ten years in state prison); (5) a conviction for driving under the influence in 1991 (three years

11  probation); (6) three separate probation violations; (7) a burglary conviction in 1992 for

12  residential burglary (twelve years in state prison); and (8) four more violations of the conditions

13  of his parole following his release.  Probation, parole, and imprisonment have all failed to

14  prevent Petitioner's criminal conduct.

15      A 30-to-life sentence does not raise an inference of gross disproportionality to

16  Petitioner's current crimes in light of his criminal history.  See, e.g. Harmelin v. Michigan, 501

17  U.S. 957, 111 S.Ct. 2680 (1991) (plurality opinion) (upholding sentence of life without

18  possibility of parole for first offense of possession of 672 grams of cocaine); Hutto v. Davis, 454

19  U.S. 370, 370-71, 375, 102 S.Ct. 703 (1982) (rejecting challenge to a 40 year sentence for

20  possession with intent to distribute less than nine ounces of marijuana); Rummel v. Estelle, 445

21  U.S. 263, 265-66, 100 S.Ct. 1133 (1980) (upholding a life sentence imposed under a recidivist

22  statute where the three felonies were passing a forged $28.36 check, fraudulent use of a credit

23  card to obtain $80.00 worth of goods and services, and obtaining $120.75 by false pretenses).

24  The Fifth DCA's denial of Petitioner's Eight Amendment claim was not objectively

25  unreasonable within the meaning of 28 U.S.C. § 2254(d).  See, e.g., Lockyer, 538 U.S. at 76

26  (denying habeas claim that Three Strikes sentence of 50 years to life was unconstitutionally

27  disproportionate to conviction for two counts of shoplifting videotapes worth total of $153.54,

28  where defendant had suffered three prior convictions for residential burglary).  Accordingly,

1  Petitioner is not entitled to habeas corpus relief on his Eighth Amendment claim.

2  **C.    Claim Three: Due Process Violations**

3  In his third claim, Petitioner asserts a number of due process violations.  Petn. at 45-53.

4  Specifically, Petitioner alleges: (1) the arresting officer lied on several occasions when he stated

5  he saw Petitioner wearing a jacket as he went into the Bakersfield Hotel and when he was taken

6  into custody; (2) the police "planted" evidence against him; and (3) the trial court abused its

7  discretion by refusing Petitioner's requests for substitute counsel.

8  1.    Perjured Testimony

9  Petitioner accuses Officers Roy and Riddle of repeatedly lying about the clothing

10  Petitioner was wearing at the time of his arrest.  In particular, Petitioner asserts the officers lied

11  in testifying that: (a) Petitioner tossed something from the pocket of his jacket as he was fleeing

12  through the Bakersfield Hotel; (b) Petitioner was wearing a jacket at the time he was taken into

13  custody; and (3) a bus pass bearing Cantrell's name was taken from one of the pockets of said

14  jacket.

15  A prosecutor has a constitutional duty to correct testimony he knows to be false.  Napue

16  v. Illinois, 360 U.S. 264, 269-70 (1959); N. Mariana Islands v. Bowie, 243 F.3d 1109 (9th

17  Cir.2001).  If there is "any reasonable likelihood that the false testimony could have affected the

18  judgment of the jury," the conviction must be set aside.  United States v. Agurs, 427 U.S. 97, 103

19  (1976).

20  Petitioner claims that the officers' testimony must necessarily be false because the

21  prosecution never produced the jacket.  First, Petitioner provides no evidence to contradict the

22  testimony of the officers.  Moreover, Petitioner's argument fails in light of the substantial

23  evidence – beyond the missing jacket – connecting Petitioner to the theft.  As noted above,

24  Officer Roy attempted to stop Petitioner as Petitioner was walking near the crime scene and

25  generally matched the description of the suspect.  Petitioner fled from Officer Roy, who followed

26  him into the Bakersfield Hotel.  Officer Roy witnessed Petitioner throw something into a

27  communal bathroom in the hotel as he ran.  After Petitioner tripped and was apprehended, Roy

28  searched the bathroom into which he had seen Petitioner discard something.  The search revealed

ed                                    20

three twenty-dollar bills, a Barnes and Noble card, and a birth certificate, the latter two bearing the victim's name.  A subsequent search of Petitioner at the county jail revealed a bus pass also bearing the victim's name.  Given this evidence of Petitioner's guilt, the officers' testimony that Petitioner was wearing a jacket could not have affected the jury's determination.

### 2.   Planted Evidence

Petitioner further claims the police attempted to plant evidence in the form of clothing Petitioner was allegedly wearing at the time he was booked into jail.  Petn. at 48, citing RT at 145-47.  Petitioner appears to claim that a bag of clothing marked "Refused to sign" was booked as Petitioner's property when he was processed into jail, but that this clothing was not the clothing Petitioner was wearing at the time of his arrest.

Petitioner's conclusory allegation lacks support in the record.  There is no record of the contents of this bag of clothing, and nothing on the record indicates that either the prosecutor or Petitioner ever offered this evidence at trial.  Since this allegedly manufactured evidence was never used at trial, it could not have impacted the jury's determination of guilt.  Accordingly, Petitioner's claim is without merit.

### 3.   Improper Denial of Requests for Substitute Counsel

Finally, Petitioner alleges a due process violation in that the trial court denied his various requests for substitute counsel.  Petn. at 49-53.  This appears to be a claim that his Sixth Amendment right to counsel was violated because the state trial court denied his Marsden requests.  See People v. Marsden, 2 Cal.3d 118 (1970) (a California criminal defendant may move for substitute counsel if his appointed counsel is rendering ineffective assistance).

The Sixth Amendment requires an inquiry on the record into a defendant's grounds for a Marsden motion, and that the matter must be resolved on the merits before the case continues. Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).  If failure to conduct such an inquiry results in the constructive denial of counsel, it constitutes error per se.  Id. at 1027. However, the Sixth Amendment guarantees only competent representation, not a meaningful relationship between counsel and defendant.  Morris v. Slappy, 461 U.S. 1, 13-14 (1983).

In denying Petitioner's Marsden motions, two different state court judges found that

1   Petitioner was receiving effective assistance of counsel.  Petitioner's complaints involved

2   differences over trial strategy, which are not appropriate grounds for appointing substitute

3   counsel.  See Schnell, 218 F.3d at 1026, n.8 (quoting Brookhart v. Janis, 384 U.S. 1, 8 (1966)

4   (Harlan, J., dissenting in part)) ("'[A] lawyer may properly make a tactical determination of how

5   to run a trial even in the face of his client's incomprehension or even explicit disapproval.'").

6   The court further found that Petitioner was not credible in his descriptions of trial counsel's

7   alleged deficiency.  See, e.g., Petn. at 122; RT (Feb. 29, 2003) at 13.  We must defer to the trial

8   court's credibility determination, absent clear and convincing evidence to the contrary.  28

9   U.S.C. § 2254(e)(1).

10      We find that the trial court's inquiry into and resolution of Petitioner's Marsden motions

11   comported with due process.  Accordingly, Petitioner's claim should be denied.

12      **D.      Claim Four:  Improper Admission of Testimony**

13      In his fourth claim, Petitioner asserts that his constitutional due process rights were

14   violated as a result of the admission of the testimony of the victim, Mr. Cantrell.  Petn. at 5, 55-

15   61.  Petitioner asserts that Mr. Cantrell "was not qualified to testify due to his mental

16   limitations."  Petn. at 56.  Specifically, Petitioner asserts that Mr. Cantrell had difficulty

17   understanding questions posed to him, and that he should have been found incompetent by virtue

18   of his inability to distinguish truth from falsehood.  Id.

19      1.      State Court Review

20      Petitioner's claim was rejected by the Fifth DCA in a reasoned opinion.  In holding that

21   the state trial court had not violated Petitioner's due process rights by admitting the testimony of

22   Mr. Cantrell, the Fifth DCA wrote:

23          "In general, every person, irrespective of age, is qualified to be a witness.
        (Evid. Code, § 700; [citation].)  A witness is disqualified from testifying only if he
24      or she is incapable of expressing him or herself so as to be understood, or is
        incapable of understanding the duty of a witness to tell the truth.  (Evid. Code, §
25      701, subd. (a); [citations].)  The party challenging the witness bears the burden of
        establishing lack of competence. [Citations.] Whether a witness has the capacity
26      to communicate and an understanding of the duty to testify truthfully is a
        preliminary fact to be determined exclusively by the trial court, whose
27      determination will be upheld absent a clear abuse of discretion. [Citation.] A
        witness who is disqualified from testifying is unavailable for purposes of
28      Evidence Code section 1360.  (Evid. Code, § 240, subd. (a)(2).)" (*People v.*

*Roberto V.* (2001) 93 Cal.App.4th 1350, 1368.).

[Petitioner] suggests the "real problem" with Cantrell was that he was unable to understand his duty to tell the truth as required under Evidence Code section 701, subdivision (a)(2). As evidence of Cantrell's limited understanding of veracity, [Petitioner] points to the following dialogue between Cantrell and the prosecutor on redirect examination:

"Q. Mark, you know the difference between the truth and a lie, right?

"A. Wrong from right.

"Q. Wrong from right. If I were to tell you that my shirt was blue --

"A. Not anymore, you changed it, because your shirt is white.

"Q. If I were to tell you it was blue, would that be a lie or would it be the truth?

"A. The truth.

"Q. This shirt's blue.

"A. No.

"Q. So would that be wrong or would it be right?

"A. It's white. [¶] ... ... [¶]

"Q. If I told you that it was blue –

"A. You changed the colors.

"Q. I would have changed it. So by me telling you that it's blue, is that right or wrong?

"A. White.

"Q. It's right that it's blue?

"THE COURT: White.

"[PROSECUTOR]: White. Sorry. I got it. Let me try something else.

"Q. How about a brown suit. If I were to tell you that this brown suit is green --

"A. Green

"Q. Yeah. Would that be right or wrong?

"A. Right.

1    "Q. It would be correct?

2    "A. I personally can't tell.  Looks green to me.

3    "[PROSECUTOR]: I'm sorry.

4    "THE COURT: Green to me too.

5    "[PROSECUTOR]: I'm sorry.

6    "THE COURT: Maybe we ought to ask you that question.

7    "[THE PROSECUTOR]: I ought to ask my wife.  Sorry.

8    "Q. Mark, if I told you that this was black, my suit was black,
     would that be truth or a lie?  Would it be right or wrong?
9
     "A. Right.
10
     "Q. It would be right?  You think my suit's black?
11
     "A. No.
12
     "Q. So that would be wrong.
13
     "A. That's true.
14
     "Q. If I told you that my suit was brown or green, would I be
15   telling the truth?

16   "A. Yeah, you're telling the truth.

17   "Q. If I told you it was black, would I be lying?

18   "A. No.

19   "Q. No?

20   "A. It's green."

21   At the close of the prosecution's case, [Petitioner] moved for an acquittal
     based on Cantrell's incompetence.  (Pen. Code § 1118.1.) [Petitioner] argued
22   Cantrell was unable to respond to questions in a rational manner, did not
     understand the questions, and lacked the capacity to respond.  Rejecting
23   [Petitioner's] challenge, the trial court ruled:

24        "Based on the testimony of the witness and sitting next to
          him here and observing him for at least 30 to 40 minutes, I'm
25        going to find that his testimony indicated an ability to differentiate
          between truth and falsehood, find that he did understand the duty to
26        tell the truth at the time he testified.

27        "Some words it did not appear that he understood, but I
          think the gentleman was able to articulate what occurred.  He was
28        asked several different – he was asked about the events in several

1    different ways, and then reasked, and I find that when I consider
the totality of the testimony that he was competent to testify
2    because he could differentiate between truth and falsehood.

3       "He had a little trouble with the suit example and he could
get the colors right.  I'm not sure if he understood the words true or
4    false or lie, but he did indicate to us that he understood what the
truth and what a lie meant and, therefore, we are going to find that
5    he is competent."

6      Notwithstanding the above puzzling line of testimony in which not only
Cantrell but also the prosecutor and the trial court became confused, Cantrell was
7    able to relate the salient facts concerning the incident at the bus station.  Although
Cantrell occasionally provided unresponsive answers to the questions posed, he
8    nevertheless consistently provided a description of [Petitioner] as the person who
accosted him and stole his wallet. [Petitioner] failed to demonstrate Cantrell was
9    an incompetent witness who was incapable of expressing himself or of
understanding the duty to tell the truth.  (Evid. Code, §§ 700, 701, subd. (a.).)

10

11      Even excluding Cantrell's testimony, however, it was not reasonably
probably [sic] the jury would have reached a verdict more favorable to
12    [Petitioner]. (*Chapman v. California*, (1967) 387 U.S. 18, 17 L.Ed.2d 705.)
Cantrell reported a theft and description of the suspect to the police.  The police
13    shortly thereafter apprehended [Petitioner] and recovered exactly $60 and
Cantrell's Barnes & Noble membership card, birth certificate, and bus pass either
14    directly from him or at the immediate scene of the arrest.  Absent any explanation
as to why [Petitioner] possessed Cantrell's personal belongings, the jury could
15    reasonably infer [Petitioner] personally took them from Cantrell against his will.

16  Answer, Ex. 7 at 3-6.

17         2.     Analysis of Petitioner's Claim

18      As a preliminary matter, the Court notes that an allegation that the admission of evidence

19  is incorrect under state law does not form a basis for federal habeas corpus relief.  See <u>Estelle v.</u>

20  <u>McGuire</u>, 502 U.S. 62, 67, 112 S.Ct. 475 (1991) ("We have stated many times that federal habeas

21  corpus relief does not lie for errors of state law."); <u>see also</u> <u>Walters v. McCormick</u>, 122 F.3d

22  1172, 1175 (9th Cir. 1997) ("We do not review the admission for error; 'we may only consider

23  whether [Petitioner's] conviction violated constitutional norms.' [citation].")

24      Petitioner argues that Cantrell was incompetent to testify, and that admitting his

25  testimony therefore violated Petitioner's rights to confrontation of witnesses and due process.

26  The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions,

27  the accused shall enjoy the right...to be confronted with the witnesses against him...."  U.S.

28  Const. Amend. VI.  This right, incorporated by the Fourteenth Amendment to apply to state

1 | prosecutions, "guarantees the defendant [not only] a face-to-face meeting with witnesses

2 | appearing before the trier of fact," Coy v. Iowa, 487 U.S. 1012, 1016 (1988), but also the right to

3 | cross-examine those witnesses.  Pointer v. Texas, 380 U.S. 400, 404, 406-07 (1965).

4 | However, the Confrontation Clause guarantees only "an opportunity for effective cross-

5 | examination, not cross-examination that is effective in whatever way, and to whatever extent, the

6 | defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292 (1985).  "The

7 | Confrontation Clause includes no guarantee that every witness called by the prosecution will

8 | refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.  To the

9 | contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair

10 | opportunity to probe and expose these infirmities through cross-examination, thereby calling to

11 | the attention of the factfinder the reasons for giving scant weight to the witness' testimony."

12 | Fensterer, 474 U.S. at 21-22, 106 S.Ct. 292.

13 | We find the determination of the state courts is not contrary to, nor an unreasonable

14 | application of settled Supreme Court precedent.  The trial court found that although Cantrell did

15 | not understand some questions asked of him, and at times gave nonresponsive answers, he did

16 | display an ability to grasp the difference between a true statement and a lie, and that he was

17 | therefore competent to testify.  In upholding Petitioner's conviction, the Fifth DCA noted that

18 | Cantrell was able to testify as to the salient facts concerning the incident, and that he consistently

19 | provided a description of Petitioner as the perpetrator of the theft of his wallet.  We agree that,

20 | while not an ideal witness, Cantrell was competent to testify.  Although Cantrell's responses to

21 | the questions regarding truth and lies were not entirely clear, We do not find that they indicate an

22 | inability to distinguish truth from lies.  Given that Cantrell occasionally provided unresponsive

23 | answers to questions posed, a finder of fact might well look with scepticism on his testimony;

24 | however, that is a question of weight, not admissibility.

25 | Moreover, even if Cantrell's testimony was improperly admitted, Petitioner would still

26 | not be entitled to relief.  The Fifth DCA analyzed Petitioner's claim under Chapman v.

27 | California, 386 U.S. 18 (1967) and determined that "it was not reasonably probable the jury

28 | would have reached a verdict more favorable to [Petitioner]" had Cantrell's testimony been

1   excluded. We agree. In addition to Cantrell's testimony, testimony was presented that Officer

2   Roy approached Petitioner since Petitioner generally matched the description of the suspect in

3   the theft of Cantrell's wallet. Petitioner fled from Officer Roy, leading him into the Bakersfield

4   Hotel where Roy saw Petitioner throw some objects into an upstairs bathroom. Petitioner was

5   apprehended after tripping on the hotel stairs. A search of the bathroom into which Petitioner

6   threw objects revealed three twenty-dollar bills, a Barnes and Noble card, and a birth certificate,

7   the latter two items bearing the victim's name. Petitioner was subsequently searched at the

8   county jail and found to have a monthly bus pass also bearing Cantrell's name. Given this

9   evidence against Petitioner, it is not reasonably probable that the jury would have reached a

10  different verdict had Cantrell's testimony been excluded. Accordingly, Petitioner's claim should

11  be denied.

12                              **RECOMMENDATION**

13          The Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be

14  DENIED and the Clerk of the Court be DIRECTED to enter judgment.

15          These Findings and Recommendations are submitted to the United States District Court

16  Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the

17  Local Rules of Practice for the United States District Court, Eastern District of California.

18          Within thirty (30) days after being served with a copy, any party may file written

19  objections with the court and serve a copy on all parties. Such a document should be captioned

20  "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections

21  shall be served and filed within ten (10) court days (plus three days if served by mail) after

22  service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to

23  28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the

24  specified time may waive the right to appeal the District Court's order. Martinez v. Y1st, 951

25  F.2d 1153 (9th Cir. 1991).

26  IT IS SO ORDERED.

27  **Dated:   April 14, 2008**              **/s/ John M. Dixon**
                                             UNITED STATES MAGISTRATE JUDGE

28